**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT WHITSITT and** | : | |
| **THOMAS SHINE** | : | |
| | : | |
| **Plaintiffs,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 11-7842** |
| | : | |
| **COMCAST-SPECTACOR, L.P.,** | : | |
| | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

**Tucker, C.J.**                                                                              **July 28, 2014**

On November 14, 2013, this Court denied cross-motions for summary judgment filed by the parties in this matter.  Presently before the Court is Defendant Comcast-Spectacor, LP's Motion for Reconsideration or, in the Alternative, for Certification of Interlocutory Appeal and Stay (Doc. 49) of the Court's November 14, 2013 Order, Plaintiffs' Response in Opposition thereto (Doc. 51), and Defendant's Reply (Doc. 52).  For the reasons more fully set forth below, the Court grants Defendant's Motion for Reconsideration and reverses its previous denial of Defendant's Motion for Summary Judgment.

### I.        FACTUAL AND PROCEDURAL BACKGROUND[1]

Robert Whitsitt ("Whitsitt") and Thomas Shine ("Shine") (collectively, "Plaintiffs") bring this breach of contract action against Defendant Comcast-Spectacor, L.P. ("CSLP").  Whitsitt, a resident of Washington, was formerly the president of the Seattle Seahawks and the Portland

---

[1]  Plaintiffs have seen fit not to include a statement of facts in any of their briefings.  As a result, this factual history is compiled from Defendant's Motion for Summary Judgment and from an examination of the parties' exhibits.  To the extent a fact is disputed, the Court highlights the dispute by referring to each side's evidence.

Trailblazers.  Shine, a resident of Indiana, was until recently a senior vice president of Reebok International Ltd. and is currently an investor and entrepreneur operating in the sports industry. CSLP is a limited partnership organized and existing under the laws of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.  CSLP was formed in 1996 to own and operate, *inter alia,* the Philadelphia Flyers, the Philadelphia 76ers ("Sixers" or the "Team"), and what is now known as the Wells Fargo Center (the arena where both teams play their home games) (Verification of Philip Weinberg in Support of Defendant's Motion for Summary Judgment [Weinberg Verif.] ¶ 2.)  Edward Snider ("Snider") has served as CSLP's Chairman or Chief Executive Officer since its formation.  Philip Weinberg ("Weinberg") is General Counsel to, and Vice President of, CSLP.

On January 24, 2011, CSLP entered into an agreement with Shine and Whitsitt to pay them a two million dollar fee if Plaintiffs first introduced CSLP to the purchaser of the Philadelphia 76ers.  (Weinberg Verif., Ex. 4.)  CSLP sold the Philadelphia 76ers to an entity known as Sixers Holdco L.P. ("Sixers Holdco") in a deal that closed on October 17, 2011. (Weinberg Verif. ¶ 3.)  Plaintiffs admit that they did not introduce CSLP to Sixers Holdco, Joshua Harris ("Harris"), David Blitzer ("Blitzer"), or any investor in Sixers Holdco other than a single minority investor named Jason Levien ("Levien") (Def.'s Mot. Summ. J., Ex. C; Shine Dep. 48:6 – 48:17.)  Despite Levien's limited involvement in Sixers Holdco, Plaintiffs requested payment from CSLP several days prior to the closing on the sale of the Sixers, claiming they had done all that was required of them to earn their fee.  (Def.'s Mot. Summ. J., Ex. C4.)  CSLP refused to make the two million dollar payment to Plaintiffs on the grounds that neither Shine nor Whitsitt had first introduced the purchaser of the Team to CSLP.  (Pls.' Mot. Summ. J., Ex. C.) This contractual dispute is the central issue before the Court.

### A.   CSLP's Early Efforts to Sell the Team

As early as 2006, CSLP began to investigate the possibility of selling the Philadelphia 76ers and engaged Galatioto Sports Partners ("GSP") to assist in this effort.  (Weinberg Verif. ¶ 4-5.)  GSP provides advisory, lending, and investment services to the professional sports industry. CSLP specifically granted GSP the exclusive right to "identify opportunities" to divest the Team, to provide financial advisory services in connection with any sale, and to participate in negotiations of a sale transaction if requested. (Id. ¶ 5.)  CSLP agreed to pay GSP a success fee equal to one percent of the value of the consideration (as defined in that agreement) CSLP received in a sale. (Id.)

Without publicly advertising the Team or conducting an auction, GSP presented the Sixers to persons and/or entities it knew were potentially interested in acquiring a professional sports team. (Id. ¶ 6.) GSP also maintained and controlled access to a secure data room for each prospective purchaser containing confidential business and financial records of the Team. (Id.) During this process, interested parties typically obtained general information about the Team and then submitted a nonbinding offer detailing a general price range for the Team along with other terms and conditions. (Id. ¶ 8.)  If an offer interested CSLP, the potential purchaser was given additional information and the purchaser would conduct in depth due diligence and negotiations. This was a slow process. (Id.)

In the years following GSP's engagement, CSLP participated in a number of significant negotiations with potential purchasers, but did not reach agreement on the terms of a sale of the Team.  Included in these potential purchasers was Joshua Harris, the current controlling owner of the Sixers.  (Id. ¶ 8.)  Harris engaged in protracted negotiations with CSLP to purchase the Team during the second half of 2009 and into August 2010.  (Id. ¶¶ 8-9.)  Throughout his initial

negotiations with CSLP, Harris sought to attract potential co-investors to his bid, but CSLP prevented him from doing so.  (Id. ¶ 10.)  Ultimately, Harris submitted an official offer for the Team on June 8, 2010.  (Weinberg Verif., Ex. 1.)  That offer was rejected by CSLP.  (Id.)  Harris allegedly agreed to leave his offer "on the table" should CSLP change its position about co-investors and diligence expenses.  (Id.)  Plaintiffs dispute CSLP's contention that, after June 2010, Harris was still actively negotiating to purchase the Team; rather, Plaintiffs assert that Harris did not again become interested in purchasing the Team until Jason Levein, under circumstances that remain in dispute, approached Harris about joining a purchasing group with Levien and Blitzer. (Levien Dep. 139:21 – 141:14; 191:1 – 24.)

## B.    Plaintiffs Express Interest in Forming a Group to Purchase the Sixers

Among several other competing bidders for the Sixers was a group led by Plaintiffs. Shine, a social acquaintance of Snider, first learned of CSLP's desire to sell the Sixers in 2006. (Def.'s Mot. Summ. J., Ex. C; Shine Dep. 43:9 – 43:14.)   In July 2008, Shine arranged a meeting with Snider in which Whitsitt, Shine, and Snider discussed the potential sale of the Sixers.  (Def.'s Mot. Summ. J., Ex. B; Whitsitt Dep. 31:11 – 32:19.)  Plaintiffs did not actively pursue a purchase of the Sixers following this meeting and they did not contact CSLP again until August 2010.

In the spring of 2010, Shine held a series of conference calls during which he asked Levien if he and longtime player-agent Happy Walters ("Walters") would be interested in investing in a group that would ultimately purchase the Sixers.  (Def.'s Mot Summ. J., Ex. D; Levien Dep. 35:16 – 36:2; 37:9 – 37:13.)  Levien and Walters expressed interest in the opportunity and in August 2010, Shine approached Snider with renewed interest in purchasing the Sixers.  (Weinberg Verif. ¶ 12; Weinberg Verif., Ex. 2.)  GSP officially identified Shine and

4

Whitsitt as potential purchasers at this point.  After Shine and Whitsitt signed a non-disclosure agreement ("NDA"), they were provided with access to confidential team financials through the unique electronic data room maintained by GSP.  (Weinberg Verif., Ex. 2.)

In agreeing to the NDA, Shine and Whitsitt identified at least one other party as a potential group member to GSP, but did not specifically identify Levien or Walters as members of their group subject to the NDA.  Neither Levien nor Walters signed a non-disclosure agreement with GSP or CSLP in August 2010.  Despite the lack of an NDA, Levien reviewed the confidential documentation provided to Shine and Whitsitt as a member of a third-party investment group.  (Def.'s Mot. Summ. J., Ex. D; Levien Dep. 58:21 – 59:11.)

In addition, throughout September and October 2010, Plaintiffs advised GSP that they were analyzing information downloaded from the data room. However, Plaintiffs repeatedly advised that they would need more time to complete their analysis and extended the time frame within which they said they would submit an offer.  Plaintiffs never did submit an offer.

### C.   Shine and Whitsitt Introduce Levien to CSLP

On November 4, 2010, Shine, Whitsitt, Snider, and Weinberg had a meeting in which Shine and Whitsitt offered to introduce CSLP to potential buyers of the Sixers.  (Weinberg Verif. ¶ 14.)  In return for the introduction, Shine and Whitsitt requested a fee if their potential buyers were to ultimately purchase the Sixers.  CSLP was unwilling to agree to such a broad agreement, and specifically wanted to limit the scope of the agreement to purchasers who were completely new to the negotiations.  (Def.'s Mot. Summ. J., Ex. C; Shine Dep. 125:22 – 126:4.)   Both parties agreed upon the broad strokes[2] of this agreement, but no deal was finalized during this

---

[2]   According to Shine, neither the fee nor the specifics were discussed during this initial meeting, only the general requirement for Shine and Whitsitt to "bring … new, fresh or fresh buyers to the marketplace."  (Shine Dep. 125:4 – 126:12.)

initial meeting.  Despite the lack of a formal agreement, Shine and Whitsitt introduced Levien

and Walters to Weinberg and CSLP for the first time later that day or early the next day.

(Weinberg Verif. ¶ 15.)

> **D.**   **Formation of the Agreement**

On November 30, 2010, Shine contacted Weinberg in an attempt to complete their fee

agreement negotiations.[3]  (Def.'s Mot. Summ. J., Ex. C5.)  Shine's e-mail to Weinberg sought

assurances that Plaintiffs would be compensated if they introduced CSLP to the "whale" that

purchased the team. (Id.)  Weinberg responded to Shine's request to finalize their agreement on

December 9, 2010 by forwarding Shine a draft fee agreement.[4]  (Weinberg Verif., Ex 4.)  During

---

[3]   Shine's e-mail to Weinberg reads, in full:

> Dear Phil:
>
> Hope this e mail finds you well, and having enjoyed a great Thanksgiving.  I would like to at your convenience get a summary agreement letter of our lunch discussion [a]nd my subsequent call with Ed, outlining compensation IF we (Bob and I) are the parties that bring in the prospective buyer. As I told Ed, we have "several'['] interested parties, and before we proceed we need to know that we are all in agreement on the compensation assuming we bring in the "whale[.]"
>
> Thank you[,]
> Tom

(Def.'s Mot. Summ. J., Ex. C5.)

[4]   The draft fee agreement reads, in full:

> Tom, as promised, please allow this email to confirm the economic terms and material conditions upon which Philadelphia 76ers, L.P. ("Club") will compensate you and Bob Whitsett [sic], collectively (the "Finder"), in the event the Finder first introduces a "Purchaser" (as hereinafter defined) of the Club to Comcast Spectacor, L.P. ("Club Owner") in accordance with the provisions below.
>
> The Finder's right to compensation shall be only with respect to a "Purchaser", who shall meet the following criteria in all respects:
>
> 1. The Purchaser shall be identified to Club Owner not later than the close of business on Wednesday, December 8, 2010. As of this time, Individuals identified to Club Owner as potential Purchasers are Happy Walters and Jason Levien.
>
> 2. Not later than May 17, 2011, Club Owner and Purchaser (or an entity owned in whole or in part by Purchaser) shall have entered into a definitive, binding agreement (acceptable to Club Owner in its sole   discretion), whereby Purchaser shall be the "Controlling Owner" (defined by the NBA to

subsequent weeks of negotiations with Weinberg, Shine only took issue with the draft agreement's restrictions on the closing date for the sale of the Sixers. (Id.)

Throughout the negotiations leading to the final contract, Shine and Whitsitt exchanged emails regarding their strategy and counter-proposals. In these emails, Shine and Whitsitt clearly differentiated between introductions for individual purchasers and group purchasers. (Def.'s Mot. Summ. J., Ex. C6.) Shine and Whitsitt also clearly identified their two prospective purchase groups as the "Happy Walters/Jason Levien Group" and the "Schottenstein Group" (led by an individual named Jay Schottenstein). (Id.) Shine and Whitsitt's counter-proposal also included language indicating their desire for their fee to be earned when a purchaser buys "all or part of the team…" (Id.) Shine and Whitsitt's proposal was not incorporated into the final agreement.[5]

Following several weeks of negotiations, Shine and Weinberg ultimately agreed upon a final fee agreement on January 24, 2011 (the "Agreement"). The Agreement, as set forth in Weinberg's January 24, 2011 email to Shine, reads, in its entirety:

---

mean that such   person [if not a publicly held company] owns not less than 15% of the equity interests in the franchise, and  has exclusive authority to manage the operations of the franchise and bind the franchise with respect to all operations matters, subject to certain exceptions) of the franchise at the close of the transaction.

3. The transaction pertaining to the sale of the franchise shall be approved by the NBA and shall then close in accordance with the terms of the definitive binding agreement.

Should the above referenced conditions be satisfied, Club [O]wner shall pay Finder the sum of Two Million Dollars ($2,000,000.00) upon closing of the transaction.

Tom, please let me know of any questions concerning the above, or otherwise, please acknowledge your agreement with foregoing.

(Weinberg Verif., Ex 4.)

[5]   <u>Compare</u> (Def.'s Mot. Summ. J., Ex. C6) ("If the potential buyer closes on the purchase of <u>all or part of the team</u> within one year of our introduction, we receive our $2M fee at closing.") <u>with</u> (Weinberg Verif. Ex. 4) ("…in the event the Finder first introduces a "Purchaser" (as hereinafter defined) <u>of the Club</u> to Comcast Spectacor, L.P. ("Club Owner") in accordance with the provisions below.") (emphasis added).

Tom, as promised, please allow this email to confirm the economic terms and material conditions upon which Philadelphia 76ers, L.P. ("Club") will compensate you and Bob Whitsett [sic], collectively (the "Finder"), in the event the Finder <u>first</u> <u>introduces</u> a "<u>Purchaser</u>" (as hereinafter defined) of the Club to Comcast Spectacor, L.P. ("Club Owner") in accordance with the provisions below.

The Finder's right to compensation shall be only with respect to a "Purchaser", [sic] who shall meet the following criteria in all respects:

1.      The <u>Purchaser</u> shall be <u>identified</u> to Club Owner, and shall be acceptable to Club Owner in its sole discretion. As of this time, Individuals identified to Club Owner (each of which is hereby deemed to be acceptable to Club Owner) as potential Purchasers are Happy Walters, Jason Levien and Jay Schottenstein.

2.      Not later than August 31, 2011, <u>Club Owner and Purchaser</u> (or an entity owned <u>in whole or in part</u> by Purchaser) <u>shall have entered</u> <u>into a definitive, binding agreement</u>, acceptable to Club Owner in its sole discretion (which may be in the form of a summary of material economic and non-economic terms and which may be subject to the execution of definitive documentation and/or other usual and customary conditions precedent to closing upon which the parties shall agree), <u>whereby Purchaser</u> (<u>or another person</u> <u>designated by Purchaser</u> with the consent of Club Owner, in its sole discretion) <u>shall be the "Controlling Owner"</u> (defined by the NBA to mean that such person [if not a publicly held company] owns not less than 15% of the equity interests in the franchise, and has exclusive authority to manage the operations of the franchise and bind the franchise with respect to all operational matters, subject to certain exceptions) <u>of the franchise at the close of the</u> <u>transaction.</u>

3.      The transaction pertaining to the sale of the franchise shall be approved by the NBA and shall then close on or before December 31, 2011 in accordance, in all material respects, with the terms of the definitive binding agreement, as such date may be reasonably extended by the parties in the event the conditions to closing have not then been satisfied in spite of the parties' good faith efforts to do so.

Should the above referenced criteria be satisfied, Club [O]wner shall pay Finder the sum of Two Million Dollars ($2,000,000.00) upon closing of the transaction.

(Weinberg Verif., Ex. 4.) (emphasis added).  After a telephone conversation with Weinberg,

Shine agreed to the terms of Weinberg's e-mailed Agreement without significant revision.  (Id.)

**E.      Levien Leads a Group to Purchase the Sixers**

Following the introduction of Levien as a potential purchaser, Weinberg contacted GSP and authorized Levien to access the secure data room under the NDA originally signed by Shine and Whitsitt.  (Def.'s Mot. Summ. J., Ex. D2.) On November 17, 2010, Levien received access to all documents Shine and Whitsitt had access to. (Id.)  At first, Levien agreed to be bound by the terms of Shine and Whitsitt's NDA.  Just one month later, however, Levien requested a unique NDA and data room from GSP separate and apart from the one he had access to through Shine and Whitsitt.  (Def.'s Mot. Summ. J., Ex. D3.)  Levien signed his unique NDA on December 20, 2010.  Levien granted access to his unique data room to three additional persons, Michael Fink, Richard Green, and Robert Wolf, none of whom became equity purchasers of the Sixers.  (Id.)  Harris and Blitzer were not included in the list of Levien's additional investors.  (Def.'s Mot. Summ. J., Ex. D; Levien Dep. 103:8 – 103:12.)

Levien, through Levien Sports Representation International, LLC ("LSRI") submitted a preliminary statement of interest to CSLP on December 22, 2010. (Def.'s Mot. Summ. J., Ex. D4.)  The letter specifically referenced the outside investors Levien had engaged through the NDA. (Id.)  Outside of his preliminary statement of interest, Levien did not negotiate with CSLP on behalf of LSRI.  LSRI never purchased the Sixers, nor was LSRI an investor in Sixers Holdco.

**F.      Sixers Holdco Purchases the Sixers**

On January 28, 2011, Harris re-engaged[6] CSLP in negotiations for the purchase of the Sixers.  (Weinberg Verif., ¶ 18.)  On February 28, 2011, CSLP granted a modification to Harris' NDA giving him permission to approach Blitzer as a potential investor.  (Def.'s Resp. Supp., Ex.

---

[6]      Despite Plaintiffs' assertions to the contrary, (see e.g. Pls.' Opp'n Def.'s Mot. Summ. J. 5), Levien's testimony establishes it was Blitzer, not Levien, who suggested and reached out to Harris as a potential co-investor in a group purchase of the Sixers.  (Levien Dep. 139:21 – 141:14.)

1.)  Harris' representative requested a change to the proposed NDA modification allowing Harris to share documentation received under the Harris NDA with Blitzer and his representatives as well.  (Id.)  The changes were requested specifically so Harris could "feel comfortable" in not running afoul of the NDA's terms.  (Id.)

On March 11, 2011 Harris and Blitzer together signed and submitted a non-binding indicative offer to Comcast, the controlling shareholder of CSLP, to purchase a majority percentage of the Sixers. (Weinberg Verif., Ex. 5.)  The offer contained an outline of material terms under which Harris and Blitzer, identified as "Investors," would purchase a percentage of the Sixers along with unnamed co-investors.  Harris and Blitzer were the only signatories to the indicative offer.  Harris and Blitzer sent carbon copies of their offer to Snider, Weinberg, Peter Lukko of CSLP, Brad Katchur of GSP, and Levien.

Following the indicative offer, Harris, Blitzer, and their representatives entered into sustained negotiations with CSLP.  (Weinberg Verif. ¶ 22.)  It was around this time Levien informed Weinberg of his intention to participate in the purchase as a minority investor in the Harris/Blitzer group.  (Id. ¶ 21.)  Levien, however, did not inform Whitsitt or Shine of his intention to participate in the Harris/Blitzer group until May or June of 2011.  (Def.'s Mot. Summ. J., Ex. D; Levien Dep. 165:12 – 165:18.)

On October 17, 2011, the sale of the Team to Sixers Holdco was completed.  The terms of the final purchase agreement dictated that Harris and Blitzer each owned 39.13% Sixers Holdco and the Sixers.  Art Wruble, an investor associated with Harris' original negotiations, owned 13.04% of Sixers Holdco and the Sixers.  Finally, Levien Sports LP owned 8.7% of

Sixers Holdco and the Sixers.[7] (Weinberg Verif. ¶24; Weinberg Verif., Ex. 6.)   The percentage of Sixers Holdco and the Sixers owned by Jason Levien, personally, at the time of closing is unclear. (Def.'s Mot Summ. J., Ex. D; Levien Dep. 326:14-28:13.)  Levien provided cash in an amount equal to 3% of the overall cash paid to CSLP for the Sixers.  (Weinberg Verif., Ex. 5 §4.10.)  Levien's cash contribution also amounted to approximately 1% of the overall purchase valuation of the Sixers. (Id.)  Regardless of the metric used, however,  there is no doubt that Levien held at least some equity in Sixers Holdco and the Team.

> **G.    Shine and Whitsitt Learn of the Sale to Sixers Holdco**

On June 27, 2011, Shine emailed Snider regarding the potential sale of the Sixers to investors other than his "two groups" and wishing CSLP luck in completing the sale.[8]  (Def.'s Mot. Summ. J., Ex. C1.)  Shine, however, made sure to tell Snider that both of his buyers could likely beat whatever offer was on the table from the impending buyers.  (Id.)  Though, by this time, aware of Levien's participation in the Sixers Holdco group, Shine did not tell Snider of his intent to claim a finder's fee should Levien be included as a partial owner of Sixers Holdco.  Outside of the Shottenstein Group, Shine and Whitsitt had only identified one other group to CSLP: the Happy Walters/Jason Levien Group.

---

[7]    Levien and LSRI are not synonymous with Levien Sports LP.  Levien Sports LP is a limited partnership with a single general partner, Levien Sports GP, LLC.  Levien Sports GP, LLC is a corporation with a sole general partner, Levien.  Levien's original corporate entity, LSRI, was not involved with the purchase of the Team by Sixers Holdco, only Levien Sports LP.

[8]    Shine's June 27, 2011 email to Snider reads, in its entirety:

> I will contact you before the 10th, when I am in Montecito[.] Good luck with the sale[.] I have not beat either of our "two groups" up yet, but believe that we would for sure come in at a higher sale price[;] I agree with your thoughts, "bird in hand better than one in the bush[.]"

> If the bird gets out of the hand, please call me at once[.] I believe I have the right person for you, most if not all the parer [sic] work is done and I believe they will close quickly[.]

> Thanks Tom

(Def.'s Mot. Summ. J., Ex. C1.)

On July 10, 2011, Shine met with Snider to discuss, among other things, the sale of the Sixers.  (Def.'s Mot. Summ. J., Ex. C2.)  In an email to Whitsitt recounting his conversations with Snider, Shine referred to Blitzer as "[s]ome guy who oversaw Europe for Blackstone."  (Id.)  Snider also identified Levien as an investor in the group close to finalizing the purchase of the Sixers, a fact Shine noted as being proof that Levien had "[l]ied" to Plaintiffs.  (Id.)

Even after Snider informed Shine of Levien's participation in the group purchasing the Sixers, Shine did not tell Snider he felt entitled to a fee based upon Levien's participation in the Sixers Holdco group.   (Def.'s Mot. Summ. J., Ex. C; Shine Dep. 184:10 – 184:18.)  To the contrary, Shine and Whitsitt specifically agreed to withhold from CSLP their feeling of entitlement to a fee based upon a fear that CSLP would restructure the deal so as to exclude them.  (Def.'s Mot. Summ. J., Ex. B; Whitsitt Dep. 155:2 – 155:21.)

### H.    The Sixers are Sold to Sixers Holdco and Plaintiffs Demand Payment

On July 13, 2011 CSLP and Sixers Holdco agreed upon the terms of a purchase agreement for the Team.  (Weinberg Verif. ¶ 24; Weinberg Verif., Ex. 6.)  Closing occurred on October 17, 2011.  (Weinberg Verif. ¶ 3.)  In a letter dated October 11, 2011, Shine and Whitsitt demanded payment of the two million dollar fee and provided CSLP with wire instructions to their accounts. (Glazer Verif., Ex. C4.) Shine and Whitsitt intentionally decided to wait until just days before the official close of the deal to demand payment in the hopes that CSLP would not delay the deal to avoid paying them.  (Def.'s Mot. Summ. J., Ex. B; Whitsitt Dep. 155:2 – 155:25.)  Weinberg responded to Shine's demand letter via email on October 14, 2011. (Pls.' Mot. Summ. J., Ex. C.)  Weinberg, on behalf of CSLP, denied Plaintiffs' entitlement to a fee pursuant to the January 24, 2011 Agreement because the conditions entitling them to payment allegedly had not occurred.  (Id.)

## I.      The Court Denies the Parties Cross-Motions for Summary Judgment

Plaintiffs filed this action on December 27, 2011.  Following a period of discovery, the parties each moved for summary judgment on May 17, 2013.  Oral arguments were held on the cross-motions for summary judgment on September 3, 2013.  In an Order dated November 14, 2013, the Court denied both motions and set a trial date certain for this matter.  In so ruling, the Court stated only the following:

> The Court finds there remains a substantial issue as to the meaning of the term "Purchaser" under the Agreement in question, so much so that neither motion for summary judgment can be granted.  Nominally, the Agreement confronting the Court is facially unambiguous. However, the inartful drafting of the second numbered paragraph of the Agreement has resulted in a latent ambiguity in the definition of who or what qualifies a Purchaser.  The presence of this latent ambiguity requires the Court to submit the case to a jury to resolve this limited ambiguity and decide which interpretation of the Agreement truly reflects [the] intent of the parties.

(Doc. 48.)  CSLP now moves for reconsideration of the Court's November 14, 2013 Order or, in the alternative, certification of this matter for interlocutory appeal.  The Court's analysis follows.

## II.      STANDARDS OF REVIEW

### A.      Motion for Summary Judgment

Under the Federal Rules of Civil Procedure, a party is entitled to judgment as a matter of law where, upon making the appropriate motion under Fed. R. Civ. P. 56(a), the movant shows that there is "no genuine dispute as to any material fact".  Fed. R. Civ. P. 56(c).  "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir.1996).  The burden of proof rests originally with the movant to show the lack of dispute as to a material fact, and must do so by citing to specific portions of the record which demonstrate the

movant's entitlement to judgment under Fed. R. Civ. P. 56.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To determine whether a movant has demonstrated that there are no genuine issues of material fact, a court must first consider the evidence presented by the moving party and draw all reasonable inferences in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

For claims or defenses where the movant bears the burden of proof at trial, a movant "must show that it has produced enough evidence to support the findings of fact necessary to win."  El v. Se. Pennsylvania Transp. Auth. (SEPTA), 479 F.3d 232, 237 (3d Cir. 2007).  For claims or defenses that the non-movant bears the burden of proof at trial, a movant can simply point out "that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  Once the movant has met its burden of proof under summary judgment, the opposing party "must point to actual evidence in the record on which a jury could decide an issue of fact its way."  El, 479 F.3d at 238.

In order to survive summary judgment, the party opposing summary judgment must raise, "more than a mere scintilla of evidence in its favor."  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.1989).  The party opposing summary judgment must cite specific evidence in the record and may not, "rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006) (describing this phase of summary judgment as "put up or shut up time for the non-moving party").  Reliance upon "conclusory, self-serving affidavits [is] insufficient to withstand a motion for summary judgment." Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161 (3d Cir.2009). Both movant and the party opposing summary judgment must cite to evidence in the

record that would be admissible at the time of trial.  Reiff v. Marks, 2011 WL 666139, at *4

(E.D. Pa. 2011) (Rufe, J.).

In deciding a motion for summary judgment, the court is limited to determining if there is

a genuine issue as to a material fact requiring resolution by the finder of fact at trial.  See Jiminez

v. All American Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir.2007).  The court does not weigh

evidence or determine the truth in deciding if summary judgment is warranted.  Id.  Where a

party's summary judgment motion is on a matter of contract interpretation, summary judgment is

appropriate only where the contractual language at issue is subject to a single reasonable

interpretation.  Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 420–21 (3d

Cir.1999).

### B.    Motion for Reconsideration

Motions for reconsideration are considered motions to "alter or amend" judgment under

Federal Rule of Civil Procedure 59(e).  The Third Circuit has held that a motion for

reconsideration will be granted only if the moving party can demonstrate one of the following:

(1) an intervening change in the controlling law; (2) the availability of new evidence that was not

previously available; or (3) the need to correct a clear error of law or fact to prevent manifest

injustice.  Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (citing N. River

Ins. Co. v. CIGNA Reins. Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).  Motions for reconsideration,

however, should be granted sparingly "because courts have a strong interest in the finality of

judgments."  Douris v. Schweiker, 229 F. Supp. 2d 391, 408 (E.D. Pa. 2002) (quoting Cont'l

Casualty Co. v. Diversified Indus., Inc., 884 F. Supp. 937, 943 (E.D. Pa. 1995)); see also

Reynolds v. Aria Health, CIV.A. 12-2954, 2013 WL 3791010, at *2 (E.D. Pa. July 22, 2013)

("[I]n light of the court's interest in the finality of its judgments, such motions should be granted

sparingly and may not be used to rehash arguments which have already been briefed by the parties and considered and decided by the Court.") (internal citations omitted).

A finding of clear error requires a "definite and firm conviction that a mistake has been committed." Easley v. Cromartie, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001) (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).  In order to show clear error or manifest injustice, the moving party "must base its motion on arguments that were previously raised but were overlooked by the Court."  United States v. Jasin, 292 F. Supp. 2d 670, 676 (E.D. Pa. 2003).  Accordingly, a motion for reconsideration is not intended to allow a party a "second bite at the apple." Bhatnagar v. Surrendra Overseas Ltd., 52 F.3d 1220, 1231 (3d Cir. 1995). "Parties are not free to relitigate issues that the Court has already decided." Smith v. City of Chester, 155 F.R.D. 95, 97 (E.D. Pa. 1994); see also Glendon Energy Co. v. Borough of Glendon, 836 F.Supp. 1109, 1122 (E.D.Pa.1993) ("[A]a motion for reconsideration addresses only factual and legal matters that the Court may have overlooked….It is improper on a motion for reconsideration to 'ask the Court to rethink what [it] had already thought through—rightly or wrongly.'") (internal quotations omitted).  Moreover, "[a] litigant that fails in its first attempt to persuade a court to adopt its position may not use a motion for reconsideration either to attempt a new approach or correct mistakes it made in its previous one. A motion for reconsideration should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided. Kennedy Indus., Inc. v. Aparo, CIVA 04-5967, 2006 WL 1892685, at *1 (E.D. Pa. July 6, 2006) (internal quotations omitted).

# III.    DISCUSSION

At the outset, the Court notes that the issues of contract interpretation presented in this matter have been extensively argued by the parties.  The Court permitted the parties to file numerous briefs in this matter and, at CSLP's request, held oral argument on those briefings.  Although the Court declined to file a comprehensive opinion on the parties' cross-motions for summary judgment, this does not mean the complex issues presented in those briefings and reiterated at oral argument were not fully and carefully considered by the Court prior to rendering its decision.  Nonetheless, because the Court's November 14, 2013 Order provided only a brief explanation of the Court's primary reasoning in denying the summary judgment motions, resolution of CSLP's current motion necessarily entails broader discourse on the preceding summary judgment motions.  The Court, therefore, first provides a more detailed examination of the arguments the parties presented at summary judgment, and its reasoning in determining that those arguments were insufficient in granting summary judgment for either side.  The Court then proceeds to consider the arguments raised by CSLP in favor of reconsideration or interlocutory appeal.

## A.    The Court's Denial of the Motions for Summary Judgment

Under Pennsylvania law, a plaintiff seeking to proceed with a breach of contract action must establish: (1) the existence of a contract, and its essential terms, between the parties; (2) a breach of a duty imposed under the terms of the contract; and (3) damages resulting from the breach.  Ware v. Rodale Press, Inc., 322 F.3d 218, 225–226 (3d Cir.2003) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)); see also Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 102 (3d Cir. 2001) ("[T]he party alleging a breach of contract bears the burden of proving the elements of a breach of contract….")

Here, the contract at issue is the Agreement dated January 24, 2011.  CSLP admits it refused Plaintiffs' demand for payment and did not pay Plaintiffs' any fee under the Agreement. Accordingly, the parties do not contest either the existence of a contract between the parties or damages caused by a breach, if a breach occurred.  Therefore, the only issue left for the Court to resolve at summary judgment was whether CSLP breached the terms of the Agreement when it refused to pay the Plaintiffs.  Importantly, the parties agreed the definition of "Purchaser" under the Agreement controls whether or not Plaintiffs are entitled to compensation under the Agreement.  (Pls.' Mot. Summ. J. ¶ 8; Def.'s Mot. Summ. J. 13-15.)  Resolution of this central question required the Court to explicate the terms of the Agreement using principles of contract interpretation.

        1.     <u>Pennsylvania Law on Contract Interpretation</u>

"Pennsylvania law on contract interpretation and ambiguity is somewhat complicated..." <u>Bohler-Uddenholm</u>, 247 F.3d at 92.  The fundamental principle of contract interpretation under Pennsylvania law "is to ascertain and give effect to the intent of the contracting parties." <u>Amerisourcebergen Drug Corp. v. Kohll's Pharmacy & Homecare, Inc.</u>, 2012 WL 5287887, at * 4 (E.D. Pa. Oct. 26, 2012) (quoting <u>Murphy v. Duquesne Univ. of the Holy Ghost</u>, 777 A.2d 418, 429 (Pa. 2001)).  Where a contract is in writing and the terms are clear and unambiguous, "the intent of the parties is to be ascertained from the document itself."  <u>Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.</u>, 905 A.2d 462, 468 (Pa. 2006). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." <u>Krizovensky v. Krizovensky</u>, 624 A.2d 638, 642 (Pa. Super. Ct. 1993).  The meaning of an unambiguous contract is resolved, as a matter of law, by the Court.  <u>Murphy</u>, 777 A.2d at 430.

Where the language of the written contract is ambiguous, extrinsic or parol evidence may be considered to determine the intent of the parties. In re Herr's Estate, 161 A.2d 32 (Pa. 1960); see also Krizovensky, 624 A.2d at 642 ("Where the contract terms are ambiguous and susceptible of more than one reasonable interpretation... the court is free to receive extrinsic evidence, i.e., parol evidence, to resolve the ambiguity.")  A contract will be found ambiguous

> if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 614 (3d Cir.1995) (quoting Samuel Rappaport Family P'ship v. Meridian Bank, 657 A.2d 17, 21-22 (Pa. Super. Ct. 1995). To ascertain whether ambiguity exists in a contract, the court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir.1980).  Objective evidence considered by a court includes, *inter alia*, how the parties have chosen to structure the contract, any bargaining history between the parties, and conduct by the parties revealing their intent or understanding of the contract's terms. Bethlehem Steel Corp. v. United States, 270 F.3d 135, 139 (3d Cir.2001).  Ex post disagreements between the parties on the meaning of terms contained in the contract, without more, does not render an otherwise unambiguous contract ambiguous.  Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d at 94.

Under Pennsylvania law a contractual ambiguity can be either patent or latent. "While a patent ambiguity appears on the face of the instrument, a latent ambiguity arises from extraneous

or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." Id. at 93 (internal quotations and citations omitted). "A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." Id. In addition, "the alternative meaning that a party seeks to ascribe to the specific term in the contract must be reasonable; courts must resist twisting the language of the contract beyond recognition." Id.

The court determines, as a matter of law, if the extrinsic evidence presented is sufficient to state a latent ambiguity. North v. Widener Univ., 2013 WL 3479504, at * 7 (E.D. Pa. July 11, 2013) (Tucker, C.J.). If the court determines a latent ambiguity exists, it is for the jury to determine the correct interpretation of the contract in light of all evidence presented. Bohler-Uddenholm, 247 F.3d at 94. Thus, to summarize, as the Third Circuit observed in Bohler-Uddeholm:

> Pennsylvania law on ambiguity in contracts thus seems to contain a built-in tension between two principles: (1) a contract is not ambiguous, and thus must be interpreted on its face without reference to extrinsic evidence, "if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends," Duquesne Light, 66 F.3d at 614 (quoting Meridian Bank, 657 A.2d at 21-22); and (2) contractual terms that are clear on their face can be latently ambiguous, and "Pennsylvania law permits courts to examine certain forms of extrinsic evidence in determining whether a contract is ambiguous." Id. Thus, when a court is faced with a contract containing facially unambiguous language, it seems that Pennsylvania law both requires that the court interpret the language without using extrinsic evidence, *and* allows the court to bring in extrinsic evidence to prove latent ambiguity.

Id. 93-94 (emphasis in original).

2.      Interpreting the Agreement

a)      The Agreement is Unambiguous on its Face

After reviewing the plain language of the Agreement, in its entirety, the Court had little difficulty in finding its terms to be clear and unambiguous on their face.  The Agreement, in its introductory paragraph, sets forth the fundamental condition precedent that Plaintiffs must meet in order to earn the finder's fee: Plaintiffs must "first" "introduce" the "'Purchaser'" (as hereinafter defined)" of the Sixers to CSLP.  The parties do not dispute the unambiguous meanings of the Agreement's use of the terms "first" and "introduce."  (Pls.' Opp'n Def.'s Mot. Summ. J. 10; Def.'s Mot. Summ. J.13-14.) The parties only dispute the definition of "Purchaser" as that term is used throughout the Agreement.

The Agreement requires any Purchaser to meet the prerequisites[9] set forth in the three numbered paragraphs: (1) the Purchaser must have been "identified" to CSLP by the Plaintiffs; (2) not later than August 31, 2011, CSLP and the "Purchaser (or an entity owned in whole or in part by Purchaser)" must have entered into a "definitive, binding agreement…whereby Purchaser (or another person designated by Purchaser with the consent of [CSLP], in its sole discretion) shall be the 'Controlling Owner'…of the franchise at the close of the transaction"; and (3) closing on the sale of the Team must take place before December 31, 2011.

---

[9]     The Court deliberately uses the word "prerequisite," although the Agreement purports to "hereinafter define[ ]" the term "Purchaser."   The Court does not consider the subsequent numbered paragraphs to be clear "definitions" of the term "Purchaser."  The Agreement does, however, repeatedly distinguish the term from a more generic understanding by marking "Purchaser" as a unique proper noun. See Ludmer v. Nernberg, 699 A.2d 764, 766 (Pa. Super. Ct. 1997) (author's use of capital letter indicates a proper noun intended to reference a specific person, place, or thing); see also, B2B CFO Partners, LLC v. Kaufman, 2012 WL 1067904, at * 4 (D. Ariz. Mar. 29, 2012) ("Ordinarily, a capitalized word that is not a proper noun is a defined term and will reference a definition previously stated in the document.")  Though the Agreement lacks a formal definition section, the numbered paragraphs "define" the parties' understanding of what is required of a Purchaser under the Agreement.  In this way, the Agreement "defines" Purchaser through the specific prerequisites the Purchaser must meet in order to satisfy the Agreement's central condition.

The parties do not contest that the third prerequisite has been satisfied; the sale of the Team did take place before December 31, 2011.  The Court must, therefore, determine whether the first and second prerequisites have been met.  This inquiry requires the Court to resolve two issues: (1) who or what is the "Purchaser"; and (2) was that person or entity first introduced to CSLP by the Plaintiffs?

Plaintiffs and CSLP agree on the identity of the Purchaser: Sixers Holdco.  (Pls.' Opp'n Def.'s Mot. Summ. J. 2, 8-9; Def.'s Mot. Summ. J. 1.)  Because the parties agree "Purchaser" refers to Sixers Holdco, the Court need only determine if Plaintiffs first introduced Sixers Holdco to CSLP in accordance with the Agreement's prerequisites.  The answer is readily apparent: No, Plaintiffs did not first introduce CSLP to Sixers Holdco.  To reach this conclusion, the Court need only look to the deposition testimony of Shine.  When asked this question directly, Shine answered definitively: "Absolutely not." (Shine Dep. 48:6 – 48:9.)

Not to be deterred by Shine's admission, Plaintiffs instead attempt to frame the issues differently by arguing they first introduced Sixers Holdco to CSLP through their introduction of Levien to CSLP.[10]  It is undisputed that Plaintiffs' "identified" Levien to CSLP – i.e., brought Levien to CSLP's attention during a meeting on November 4, 2010.  It is Plaintiffs' contention that after this introduction, Levien both assembled and invested in Sixers Holdco, which became the Purchaser of the Team.  (Pls.' Opp'n Def.'s Mot. Summ. J.11.)  Thus, Plaintiffs claim that, by extension, they introduced Sixers Holdco to CSLP.

---

[10]   (See e.g. Pls.' Opp'n Def.'s Mot. Summ. J. 11) ("What does matter is that: (1) Plaintiffs introduced Levien to Defendant; (2) through Levien's efforts the investment group that became the Sixers HoldCo. was assembled; (3) the acquisition of the 76ers by the Sixers HoldCo. entity, which Levien owned "in whole or part," as the fee agreement explicitly provides, was approved by the NBA; and (4) the sale of the 76ers closed before December 31, 2011.") (emphasis in original) (emphasis in original); (see also Oral Argument Tr. 33:16-24) (asserting that there are "two major issues in this case": "(1) Did Plaintiffs by introducing Levien introduce the Purchaser of the Philadelphia 76ers, Sixers HoldCo," and (2) "Did Mr. Levien, through his actions — and there is competent evidence, and that's Mr. Levien's sworn testimony — did Mr. Levien set the wheels in motion that led directly to that sale.")

There is nothing in the Agreement that permits Plaintiffs' proposed reading of the Agreement allowing them to indirectly introduce a Purchaser.  The Court finds the second numbered paragraph to be inartfully written; however, the paragraph is not patently ambiguous. The problem is that this paragraph simultaneously (and confusingly) tries to account for both a situation where the Purchaser is a single individual (perhaps acting through an entity created for the special purpose of purchasing the Team) and a situation where the Purchaser is a an entity like Sixers Holdco (where many individuals with varying ownership interests collectively purchase the Team).  The second numbered paragraph of the Agreement is clumsy and lacks the precision the Court would expect from sophisticated drafters such as the parties.  This lack of precision, however, does not permit the Court to read terms into the Agreement.  There is simply no provision, on the face of the Agreement, permitting an indirect introduction of a Purchaser by Plaintiffs.

Because the meaning of "Purchaser" is unambiguous on the face of the Agreement, the Court must utilize only the words on the page to determine the parties' intent in drafting the Agreement.  Bohler-Uddenholm, 247 F.3d at 92.  Plaintiffs admit they did not first introduce Sixers Holdco to CSLP.  (Shine Dep. 48:6 – 48:9.)  As such, unless there is a latent ambiguity, the Court must find CSLP did not breach the Agreement.

b)      The Definition of Purchaser is Subject to a Latent Ambiguity

In this matter, both sides have first and foremost argued that the Agreement is unambiguous on its face, and that they are therefore entitled to judgment as a matter of law. Further, each side has repeatedly accused the other side of taking "inconsistent" or "conflicting" positions in interpreting the Agreement and thereby "misrepresenting" the supposedly "clear" and "unambiguous" terms of the Agreement.  It seems obvious to the Court, however, that this

brief and seemingly straightforward Agreement could not be vulnerable to such wildly divergent interpretations if there were not some latent ambiguity in its terms.  The source of this ambiguity, the Court found, was in the second prerequisite clause's use of the term "Purchaser."  To recap, the second numbered paragraph states the following:

> Not later than August 31, 2011, [CSLP] and Purchaser (or an entity owned in whole or in part by Purchaser) shall have entered into a definitive, binding agreement….whereby Purchaser (or another person designated by Purchaser with the consent of [CSLP], in its sole discretion) shall be the "Controlling Owner"…of the franchise at the close of the transaction.

(Weinberg Verif., Ex. 4.)   Thus, to fulfill this clause, one of two things must occur: (1) the Purchaser must become the Controlling Owner of the Sixers, or (2) the Purchaser must designate the Controlling Owner of the Sixers.

A party's claim[11] of extrinsic evidence supporting a latent ambiguity, without more, is insufficient as a matter of law to find latent ambiguity in a contract.  Bohler-Uddenholm, 247 F.3d at 96.  Evidence of latent ambiguity must always be accompanied by a "contractual hook" tying the evidence offered to a reasonable alternative meaning of a term within the contract.  Id. A party's expectation of what the contract says, or should have said, is never enough to establish a latent ambiguity.  Id.  A latent ambiguity may also arise "when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome."  Id.  Ultimately, it is for the court to determine, as a matter of law, if ambiguities exist and to interpret a contract.  In re Old Summit Mfg., LLC, 523 F.3d 134, 137 (3d Cir. 2008) (citing Hutchison v. Sunbeam Coal Corp.,

---

[11]  In their briefs, each side cites Pennsylvania law on latent ambiguity, but nonetheless argues the Agreement is not ambiguous. (See e.g., Def.'s Mot. Summ. J. 11, 13, 21; Pls.' Mot. Summ. J. ¶5; Pls.' Reply in Supp. Mot. Summ. J. 8-9.) Thus, although neither side argues there is a latent ambiguity in the Agreement, in proceeding with this analysis the Court examines the parties' filings in their entirety to determine what evidence there is of latent ambiguity.

513 Pa. 192, 519 A.2d 385, 390 (1986)).  If, however, the court finds an ambiguity, resolution of the disputed terms and the parties' intent is left to the trier of fact.  <u>Id.</u>

i.    The Parties' Contentions

As stated previously, CSLP argues Plaintiffs are not entitled to compensation under the plain terms of the Agreement because their purchaser, Levien, did not satisfy all necessary conditions under the plain language of the Agreement.  Specifically, CSLP points to the fact that Levien is not the Controlling Owner of the Sixers, nor did he designate the Controlling Owner.  Accordingly, CSLP asserts that there is no ambiguity in the Agreement and Plaintiffs are not entitled to compensation.  CSLP's interpretation of the Agreement has been clear, consistent, and reasonable throughout its briefings. [12]

In contrast, Plaintiffs presented a myriad of muddying arguments purporting to show their purchaser, Levien, has satisfied the condition of designating the Controlling Owner of the Sixers by acting through his equity share in Sixers Holdco.  (See <u>e.g.,</u> Pls.' Reply in Supp. Mot. Summ. J. 13-14.)  Because Plaintiffs have repeatedly objected to CSLP's characterization of their claim, the Court sets forth Plaintiffs' expressed understanding of the Agreement in its entirety, as Plaintiffs set forth in their response in opposition:

---

[12]    For instance, CSLP offered the following example during oral arguments:

> Assume facts that the Plaintiffs introduced us to someone and that person does put together a group and/or just decides…as is usually done in business, I am not going to acquire the Team myself in my own name, I am going to create a legal entity.  People do that for a lot of reasons, including limitation of liability.  So what we are saying is somebody comes in and has 100 percent — comes in and is going to buy the Team, but creates its own legal entity to do so. Then that's fine and we can designate if it's Miss X as the Purchaser….[A]nd as long as Miss X is the Controlling Owner, then you would be owed a finder's fee.

> (Oral Argument Tr. 23:9-22.)  CSLP went on to explain that, in situations where someone who was first introduced to CSLP by Plaintiffs created an entity to purchase the Team, but did not own 100 percent of that entity, then Plaintiffs would still be entitled to the finder's fee <i>if</i> that person they first introduced became the Controlling Owner of the Team. (Id. 23:22-24:3.)

Plaintiffs' claim is based upon their satisfaction of the following, unambiguous conditions of the written fee agreement:

> (i) That a binding agreement to purchase the 76ers be entered into by an entity  (such as Sixers HoldCo.) owned "in whole or part" by a "potential purchaser" identified by Plaintiffs to Defendant (specifically including Levien). The Purchaser (i.e., Sixers HoldCo.) did enter into such a binding agreement, and it is undisputed that the Purchaser was "owned in whole or part" by Levien;

> (ii) That the "Purchaser" under the binding purchase agreement designate a "Controlling Owner" (Harris was so designated by the Sixers HoldCo. partnership   identified as the "Buyer" of the 76ers in the Purchase Agreement), and that the NBA approve the 76ers sale (which is undisputed); and

> (iii) that the sale of the 76ers be to an entity owned in "whole or part' by an identified prospective purchaser such as Levien (Sixers HoldCo. was such an entity), and that the sale closes on or before December 31, 2011 (the sale did close in October, 2011).

(Pls.' Opp'n Def.'s Mot. Summ. J. 8-9.)  Immediately, the Court notes the explicitly self-contradictory nature of Plaintiffs' interpretation of the Agreement's "unambiguous conditions." In Plaintiffs' interpretation of the Agreement, the definition of Purchaser switches back and forth between Levien and Sixers Holdco.  By way of example, in Plaintiffs' first sentence of Plaintiff's first identified condition, Levien is the Purchaser under the Agreement and Sixers Holdco is an entity owned in whole or part by Levien as Purchaser.  However, in the second sentence of Plaintiffs' first identified condition, Sixers Holdco is the Purchaser.  The second and third identified conditions go on to assume that Sixers Holdco is the Purchaser.

The problem with Plaintiffs' formulation of the Agreement, as articulated by Plaintiffs themselves, is that accepting it would render the Agreement internally inconsistent.  Under the Agreement, there is simply no contractual language permitting the term Purchaser to alternatively refer to Levien, Sixers Holdco, or both simultaneously.  Further, "[i]t is axiomatic in contract law that two provisions of a contract should be read so as not to be in conflict with

26

each other if it is reasonably possible." <u>Keystone Fabric Laminates, Inc. v. Fed. Ins. Co.</u>, 407

F.2d 1353, 1356 (3d Cir.1969) (applying Pennsylvania law).  Under Plaintiffs' first interpretation

of the Agreement, there is simply no coherent way in which all the Agreement's prerequisites, as

set forth in the numbered paragraphs, can be met.  If the Purchaser is Levien, which it must be in

order to entitle Plaintiffs to compensation, then the second prerequisite is not met because Levien

is not the "Controlling Owner."  It is undisputed that Harris is the Controlling Owner.

 Plaintiffs' also appear to advance a second argument, which again relies on conflating

Sixers Holdco with Levien.[13]  Plaintiffs' tortured reading of the Agreement is apparent

throughout their briefing, but perhaps nowhere more apparent than the following passage:

> Under the terms of the fee agreement…the term 'Purchaser' includes an entity 'owned in whole or part' by such a prospective purchaser [as Levien].  <u>*Just such an entity* (Sixers HoldCo.) 'owned in whole or in part' by Levien, designated the 'Controlling Owner' (Mr. Harris) pursuant to the explicit, terms of the written fee agreement.</u>

(Pls.' Opp'n Def.'s Mot. Summ. J. 14) (emphasis partly in original).  In this one sentence,

Plaintiffs identify both Levien and Sixers Holdco as the Purchaser under the Agreement (in that

Sixers Holdco is an entity owned by the Purchaser, Levien), and that the Purchaser, now

explicitly Sixers Holdco and not Levien, designated the Controlling Owner).  If the Purchaser

were somehow both Sixers Holdco and Levien at the same time, then Plaintiffs would essentially

be arguing that if either Sixers Holdco or Levien satisfies any given prerequisite, then Plaintiffs

have performed their obligations under the Agreement.  However, Plaintiffs have not pointed to

any language in the Agreement that plausibly permits such a reading.

 It would seem that Plaintiffs derive this convoluted interpretation of the Agreement from

the "in whole or part" language contained in the second prerequisite. (Weinberg Verif., Ex. 4.)

Plaintiffs assert that this "in whole or part" language means that they would be entitled to the finder's fee so long as any "Purchaser" (now meaning Levien) they first introduced to CSLP owned "in whole or in part" the entity that became the "Purchaser" (now meaning Sixers Holdco) of the Team. (Pls.'s Reply in Supp. Mot. Summ. J. 16-17.)   The Court rejects this interpretation.  As a practical matter, Plaintiffs' interpretation would mean that CSLP would owe Plaintiffs a two-million dollar finder's fee so long as *any* individual that Plaintiffs first introduced to CSLP became part of any purchasing group that ultimately purchased the Sixers — no matter how small or infinitesimal that individual's ownership interest was.  It is inconceivable that CSLP intended that result.  Moreover, it is also clear that this was not Plaintiffs' contemporaneous understanding of the Agreement.[14]  The Court will not enforce such an unreasonable interpretation of the Agreement, especially in light of Plaintiffs knowledge at the time.  See Bohler-Uddeholm, 247 F.3d at 99 (Under Pennsylvania law "it is a central principle of contract interpretation that if a party knew or had reason to know of the other parties' interpretation of terms of a contract, the first party should be bound by that interpretation.").

Finally, Plaintiffs also raise an additional argument, which relies on the fact that Levien, as a plurality shareholder of Sixers Holdco, helped designate the Controlling Owner of the Team. (Pls.' Reply in Supp. Mot. Summ. J. 11; Pls.' Opp'n Def.'s Mot. Summ. J. 13-14.)  To support this argument Plaintiffs point to Levien's uncontroverted[15] deposition testimony regarding how the Controlling Owner was chosen and designated by Sixers Holdco.  Levien's testimony states that he, as much as any other member of Sixers Holdco, possessed the ability to direct Sixers

---

[14]   Indeed, Plaintiffs' argument in this respect flies in the face of Plaintiffs' expectations at the time.  Plaintiffs made absolutely clear their entitlement to payment under any fee agreement would come only if they brought in "the whale." (Def.'s Mot. Summ. J., Ex. C5.)

[15]   Harris and Blitzer have not been deposed in this matter.  Levien's deposition testimony, therefore, is the only available testimony by any shareholder in Sixers Holdco.

Holdco's designation of the Controlling Owner.[16]  (Def.'s Mot Summ. J., Ex. D; Levien Dep. 139:1 – 139:6.)   A group decision was always necessary for Sixers Holdco to designate a controlling owner; no single shareholder could do so of his own accord.  (Id.)  Levien's participation in Sixers Holdco's decision to designate Harris as Controlling Owner of the Sixers, Plaintiffs argue, is what satisfies the second prerequisite clause.[17]

> ii.   Plaintiffs' Final Proposed Interpretation of the Second Numbered Paragraph is Reasonable

After considering Plaintiffs' final argument, the Court found Plaintiffs' alternative construction reasonable in light of the potentially unforeseen situation confronting the parties. As previously discussed, the difficulty with the second numbered paragraph is that it simultaneously tries to account for both a situation where the Purchaser is a single individual (perhaps acting through an entity created for the special purpose of purchasing the Team) and a situation where the Purchaser is a an entity like Sixers Holdco (where many individuals with varying ownership interests collectively purchase the Team).  The second numbered paragraph is clear in what happens in the former situation, but less clear in what happens in the latter situation.  If the Purchaser is a single individual purchasing the Team directly, then the Agreement is clear cut.  If the Purchaser is a single individual purchasing the Team indirectly

---

[16]   Specifically, Levien testified as follows:

> Q. You didn't—but you only—you did not have the ability to tell Mr. Harris and Mr. Blitzer who was going to be the controlling owner, did you?

> A.  No.  And they didn't have the ability to tell me who would be the controlling owner.

(Def.'s Mot Summ. J., Ex. D; Levien Dep. 139:1 – 139:6.)

[17]   Relatedly, Plaintiffs have also attempted to argue that the "designation of the controlling owner by the purchaser related solely to the satisfaction of the requirement for NBA approval." (See Pls.' Reply in Supp. Mot. Summ. J. 10; Pls.' Opp'n Def.'s Mot. Summ. J. 15-16.) In doing so, Plaintiffs attempt to read the "Controlling Owner" condition out of the Agreement. This argument is illogical and incorrect.

through a special purpose entity, the Agreement is fairly clear so long as the individual is him or

herself the Controlling Owner of the Team at the close of the transaction, or designates the

Controlling Owner.

However, the language of the Agreement does not clearly or obviously contemplate a

large group purchase with a multiple plurality of shareholders.[18]  Herein lays the latent

ambiguity.  In such a situation, because the Agreement does not expressly define[19] who or what a

Purchaser must be, the plain language interpretation breaks down where no single individual has

the ability to automatically become the Controlling Owner (through owning the greatest share of

the Team) or designate the Controlling Owner.[20]  Under the Agreement, where Purchaser is

---

[18]   The Court is inclined to believe the Agreement, as written, may not contemplate large group purchases at all.  In the Court's view, the Agreement at most contemplates a purchase by two or three individuals.  The Court grounds this conclusion on a review of the evidence.  The evidence suggests that CSLP strongly preferred to sell the Sixers to a single individual.  It is for this reason that in 2010, when Harris initially engaged in negotiations with CSLP, CSLP prevented Harris from attracting potential co-investors to his bid. (Weinberg Verif. ¶¶8-10.) Specifically, "CSLP was reluctant to allow Mr. Harris to solicit other investors, because at that time CSLP was hopeful it could develop independent, competitive offers for the Team as opposed to offers from consortiums of investors." (Id. ¶10.) Thus, because CSLP would not allow co-investors, Harris' original offer was rejected as being too low.

Perhaps because of the length of time it took to find a purchaser (five years), CSLP apparently changed its position on allowing co-investors.  Thus, by the time Plaintiffs introduced Levien and Walters to CSLP and the Agreement was subsequently formulated, the parties anticipated that the potential Purchaser could be a consortium of two or three individuals.  It is for this reason that the Agreement specifically identifies Walters and Levien (the leaders of one potential purchasing group) and Schottenstein (as the leader of another potential group).  However, in these small group situations, it appears the parties anticipated that there would be a clear majority investor and clear minority investors — such that it would be obvious who the Controlling Owner would be.  The Court is doubtful the parties contemplated what actually happened here: four investors collaborating to form a purchasing group, with two of those investors possessing the same ownership interest.

This argument, however, has not been raised by either side.

[19]   Again, in the Court's view, despite using the language "as hereinafter defined," the Agreement fails to set forth an express definition of "Purchaser" at any point in the remainder of the Agreement.  The Agreement only identifies certain conditions a Purchaser must satisfy in order to entitle Plaintiffs to payment under the Agreement.  These conditions inform how Purchaser should be interpreted, but they do not precisely define the term Purchaser.

[20]   In contrast, the second paragraph of CSLP's original December 9, 2010 draft agreement reads:

2. Not later than May 17, 2011, Club Owner and Purchaser (or an entity owned in whole or in part by Purchaser) shall have entered into a definitive, binding agreement (acceptable to Club Owner in its sole  discretion), whereby Purchaser shall be the "Controlling Owner" (defined by the NBA to

understood to be an entity with plurality shareholders, no individual shareholder possesses the power to compel the company to do something such as designate a specific controlling owner. Levien's deposition testimony establishes as much.  However, the Agreement nonetheless requires something (designation of the Controlling Owner) which cannot possibly occur (because no single individual has that authority).[21]  Nothing in the extrinsic evidence submitted by the parties suggests this provision was intended to function in this way.

---

> mean that such     person (if not a publicly held company] owns not less than 15% of the equity interests in the franchise, and has exclusive authority to manage the operations of the franchise and bind the franchise with respect to all operations matters, subject to certain exceptions) of the franchise at the close of the transaction.

The December 9, 2010 draft omits the "(or another person designated by Purchaser with the consent of Club Owner, in its sole discretion)" parenthetical.  The December 9, 2010 draft agreement is written to avoid the precise ambiguity pointed out by Plaintiffs.  In the draft agreement, the second numbered paragraph can only be fully satisfied if Plaintiffs' purchaser becomes the controlling owner, him or herself.  This is exactly the type of extrinsic evidence that casts doubt on Defendant's proposed interpretation of the Agreement.  The Court is not in a position to guess as to why the drafters made such a drastic change between the draft and the final Agreement.  The Court merely takes note of the change only in so far as it relates to Plaintiffs' ambiguity arguments.

(Weinberg Verif., Ex 4.)

[21]  Plaintiffs' term this pitfall the "implausible impossibility" of the Agreement:

> Just as undeniably, if (as here), the sale of the 76ers is not to an individual, but to an "entity" "owned in whole or in part" by a prospective purchaser, such as Levien, the "definitive, binding agreement" would be between solely that <u>entity</u> (such as Sixers Holdco.) and  Defendant.

> Individual investors/prospective purchasers, such as Levien, would not be party to the "definitive, binding agreement, and, as such, could not conceivably make the designation therein of "Controlling Owner" required by the explicit terms of paragraph 2 of the fee agreement.

> And indeed, <u>no such</u> individual investors[] were parties to the July 201[1] Purchase Agreement that was the "definitive binding" agreement for the sale of the 76ers, and "whereby," as paragraph 2 requires, the "Purchaser" designated the Controlling Owner."

> Thus, Defendant's argument that under the terms of the fee agreement that in the sale to a group, designation of the controlling owner must be made in the "definitive, binding agreement" of the sale by an individual prospective purchaser such as Levien, and not by the actual purchasing entity, poses an undeniably impossible, implausible interpretation.  This is so as in any group purchase, as here, individual investors (such as Levien) WOULD NOT BE PARTIES to the "definitive binding agreement."

(Pls.' Reply in Supp. Mot. Summ. J. 13-14) (emphasis in original).

Thus, Plaintiffs' alternative construction casts a doubt on the unambiguous plain language meaning of the Agreement. Though the literal interpretation of the Agreement advocated by CSLP may function to effectuate the parties' intent in most circumstances, Plaintiffs have managed to present the Court with a situation wherein the express terms of the Agreement function ambiguously. Because the Court could not say, as a matter of law, that Plaintiffs' final interpretation of this latent ambiguity was unreasonable, the Court determined that the case needed to be submitted to a jury to resolve this ambiguity. Bohler-Uddenholm, 247 F.3d at 96.

**B.      The Court Grants CSLP's Motion for Reconsideration of the Court's Denial of its Motion for Summary Judgment**

In its Motion for Reconsideration, CSLP contends that "[t]o be entitled to a finder's fee, Plaintiffs had to comply with all the conditions set out in the Agreement." (Def.'s Mot. Recons. 6) (emphasis in original). CSLP charges that the "Court apparently overlooked CSLP's arguments that [P]laintiffs had not identified the Purchaser to CSLP as required under paragraph numbered 1 of the Agreement." (Id.) Accordingly, CSLP argues that "[e]ven if the requirements of the paragraph numbered 2 were ambiguous, [P]laintiffs' failure to comply with the remaining clear and unambiguous requirements of the Agreement mandates that judgment be entered against them." (Id.) In so arguing, the Court gathers that CSLP asserts the Court committed a clear error of law or fact, necessitating reconsideration. Max's Seafood Café, 176 F.3d at 677.

CSLP sporadically raised the argument that Plaintiffs did not "first introduce" the Purchaser to CSLP in its Motion for Summary Judgment. (See Def.'s Mot. Summ. J. 13-16, 19.) The Court, however, did not directly address the first numbered paragraph in its November 14, 2013 Order because the parties agreed at summary judgment that the definition of "Purchaser" under the Agreement controls whether or not Plaintiffs are entitled to compensation under the

32

Agreement. (Pls.' Mot. Summ. J. ¶ 8; Def.'s Mot. Summ. J. 13-15.)  Indeed, it is for this reason

that in their briefs and during oral argument, the parties devoted the vast majority of their time to

advocating for their respective interpretations of the second numbered paragraph.  Nonetheless,

the Court's failure to address the first numbered paragraph in its November 14, 2013 Order was

in error.  The Court further finds CSLP is correct in its assertion that even assuming the term

"Purchaser" as used in the second numbered paragraph is ambiguous, Plaintiffs have admittedly

failed to comply with the clear terms of the first numbered paragraph.  As such they are

precluded from recovery, and judgment must be entered in favor of CSLP.

Paragraph 1 states that "[t]he Purchaser shall be identified to Club Owner . . . ."

(Weinberg Verif., Ex. 4.)  There is no ambiguity in this requirement. As CSLP argues, this

requirement can only mean that "if [P]laintiffs believed they would be entitled to a fee if a

person or entity entering into negotiations with CSLP acquired the Sixers, [they] must so advise

CSLP when negotiations began." (Def.'s Mot. Recons. 7.)  This obligation is further evidenced

by the Agreement's requirement that Plaintiffs both "introduce" and "identify" the potential

Purchaser. (Weinberg Verif., Ex. 4.)  As CSLP argues,

> As an introduction implicitly involves bringing one person to the attention of
> another, the separate requirement to "identify" the potential "Purchaser" would be
> surplusage unless [P]laintiffs were obligated to state at the time a person becomes
> involved with CSLP that they would be entitled to a fee if that person acquired the
> Sixers. Plaintiffs clearly had to do more than just make an introduction.
>
> This is further evidenced in the right given to CSLP to approve of potential
> Purchasers presented to it. Plaintiffs must present a potential Purchaser to CSLP
> so that it could exercise this right and consent, if it believed it appropriate to do
> so, to the inclusion of such person as "first introduced" by [P]laintiffs and…as an
> acceptable candidate to acquire the Team. In fact, to illustrate what it requires,
> paragraph 1 goes on to list the individuals that Plaintiffs had already identified to
> Defendant under paragraph 1's requirements. That list included Jason Levien.

(Def.'s Mot. Recons. 7.)

Plaintiffs have admitted that they understood their obligation to identify the Purchaser. Shine testified, for example, that Plaintiffs could not wait for a buyer to show up and then "just say [the buyer is] ours and get money for [the buyer]." (Def.'s Mot. Summ. J., Ex. C; Shine Dep. 178:4-20.)  Shine also admitted that the reason for this requirement is that if he "were talking to somebody and…didn't identify them to Comcast Spectacor," Comcast Spectacor would not know this was the person Shine and Whitsitt were "identifying" as the Purchaser."(Id.) Additionally, Plaintiffs' counsel conceded at oral argument that Plaintiffs did not identify the Purchaser.  Because Plaintiffs again accuse CSLP of misrepresenting their argument, (see Pls.' Resp. Opp'n Def.'s Mot. Recons. 4), the Court repeats counsel's statement in full:

> And at a certain point, Mr. Shine and Mr. Whitsitt lost trust in the integrity of the people they were dealing with at Comcast.  And as they testified, they had no obligation to say anything before the transaction and they wanted to be safe rather than sorry and they were afraid that the transaction would be structured in a way that would squeeze them out of the deal.  And the [October 11, 2011] e-mail that Mr. Shine sent to Mr. Snider is no admission at all, it's all in the context, but Plaintiffs made a decision to only make a fee claim at a time when they thought it would be too late for the transaction to be restricted in some way that they attempt to squeeze out Mr. Levien's interest and then Sixers Holdco would no longer be an entity owned in whole or part by the person that they had identified.  That was their fear.  Whether it was a legitimate fear or not a legitimate fear, it doesn't make a bit of difference.

(Oral Argument Tr. 59:25-60:18.)  Thus, Plaintiffs' counsel concedes that Plaintiffs did not identify Sixers Holdco to CSLP, but nonetheless claims Plaintiffs had no obligation to do so.  He is incorrect, and his argument flies in the face of what Shine plainly testified to at his deposition and clearly stated in his communications with CSLP prior to the closing.

Closing on the sale of the Sixers did not occur until October 7, 2011. Plaintiffs, however, knew of the proposed sale to Sixers Holdco by June 27, 2011 at the absolute latest.  In Shine's June 27, 2011 e-mail to Snider, Shine wished CSLP luck in completing the sale and made sure to tell Snider that both of his potential buyers could likely beat whatever offer was on the table

34

from the impending buyers. (Def.'s Mot. Summ. J., Ex. C1.)  Nothing in this e-mail suggests Plaintiffs intended to assert a claim to payment, or believed they had a valid claim to payment. On the contrary, Shine's e-mail impliedly suggests Plaintiffs knew they had no claim because Sixers Holdco was not one of Plaintiffs "two groups." (Id.)  Still further, Shine met with Snider on July 10, 2011 and Snider confirmed that Levien was an investor in the group.  Plaintiffs again made no suggestion to CSLP that they intended to assert a claim to payment, or believed they had a valid claim to payment.  On the contrary, following this meeting, Shine and Whitsitt specifically agreed to delay telling CSLP they intended to assert a claim.  (Def.'s Mot. Summ. J., Ex. B; Whitsitt Dep. 155:2 – 155:21.)  Regardless of Plaintiffs' claimed reasons for not identifying Sixers Holdco to CSLP, the fact remains that that the explicit language of the Agreement requires that Plaintiffs both "introduce" and "identify" the potential Purchaser, and that the Purchaser "shall be acceptable to Club Owner in its sole discretion."  Plaintiffs are not entitled to create post hoc justifications to failing to comply with clear contractual obligations that they admittedly understood.

This is especially true considering that Plaintiffs either knew or should have known that the purpose of the "first introduce" and "identification" requirements was to avoid just what has occurred here: Plaintiffs making a belated claim to a finder's fee.  In the lead up to the formation of the Agreement and afterwards, Plaintiffs were aware of CSLP's contractual involvement with GSP.  Plaintiffs were also aware, from discussions prior to the formation of the Agreement, that CSLP specifically did not intend to pay both a success fee to GSP and a finder's fee to Plaintiffs. (Weinberg Verif. ¶ 5; Weinberg Dep. 81:17-82:1.)  Because Plaintiffs waited just days before closing on the sale of the Sixers to assert their claim, CSLP had no idea during the negotiations for the sale that Plaintiffs would claim a finder's fee; as a result, CSLP was unaware that it

would face claims for both a success fee from GSP and a finder's fee from Plaintiffs. CSLP therefore lost the opportunity to negotiate with GSP to reduce its claimed success fee if Plaintiffs could substantiate their claim or to insist upon a higher purchase price to offset its exposure to both a success and finder's fee. (Def.'s Mot. Summ. J. 17; Def.'s Mot. Recons. 8.) It can only be said that Plaintiffs' dilatory tactics are unjustifiable given how significantly it prejudices CSLP. Karpenko v. Leendertz, 619 F.3d 259, 265 (3d Cir. 2010) ("The doctrine of unclean hands, named for the equitable maxim that "he who comes into equity must come with clean hands," "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.")

In sum, the Court finds that no matter how Plaintiffs seek to interpret the second numbered paragraph — or whether Sixers Holdco, Levien, or some combination of the two is deemed the Purchaser under the Agreement — Plaintiffs' admitted failure to identify that Purchaser to CSLP is fatal to their claim. While Levien was identified as a potential Purchaser in the Agreement, that was either in his individual capacity or as a member of a group with Happy Walters.[22] Levien's participation as an indirect minority owner of Sixers HoldCo was not the introduction and identification of the "Purchaser" required by the Agreement.[23]

---

[22] It is worth noting that even the question of whether Levien is Plaintiffs' "Purchaser" is fraught with complication. At the time Levien was introduced to CSLP by Plaintiffs on November 4, 2010, it appears the parties contemplated that Levien, with Walters, would spearhead an effort to purchase the Team. It is unclear exactly when Walters fell out of the equation. At some point, however, it appears that Levien made the decision to pursue purchasing the Team on his own — but did not inform Plaintiffs of his intentions. This is evidenced by the fact that shortly after the introduction, in December 2010, Levien requested and received a unique NDA and data room from GSP separate and apart from the one he had access to through Shine and Whitsitt. (Def.'s Mot. Summ. J., Ex. D3.) Levien then granted access to his unique data room to three additional persons — Fink, Green, and Wolf — who were not previously involved in the negotiations or known to Plaintiffs. Levien, through LSRI, then submitted a preliminary statement of interest to CSLP on December 22, 2010 — a statement which referenced Fink, Green, and Wolf but made no mention of Walters or anyone else known to Plaintiffs. (Def.'s Mot. Summ. J., Ex. D4.) While the parties dispute the precise circumstances under which Levien

## IV.   CONCLUSION

At summary judgment, the Court found that although the Agreement in question was facially unambiguous, the term "Purchaser" as used in the second numbered paragraph was subject to a latent ambiguity.  The Court concluded that the presence of this latent ambiguity required the Court to submit the case to a jury to resolve this limited issue and decide which interpretation of the Agreement truly reflected the intent of the parties.  This conclusion was in error, because it is undisputed that Plaintiffs did not claim a finder's fee as a result of Sixers

---

became involved with Harris and Blitzer, the fact remains that however these three individuals became involved, Plaintiffs were entirely unaware of the fact that Levien had begun working with Harris and Blitzer.

Thus, while Levien informed Weinberg in March 2011 of his intention to participate in the Sixers Holdco purchase as a minority investor, (Weinberg Verif. ¶¶21-22), Levien did not inform Whitsitt or Shine of his intention to participate in the Harris/Blitzer group until May or June 2011.  (Def.'s Mot. Summ. J., Ex. D; Levien Dep. 165:12 – 165:18.)  It is precisely because Levien went out and began working on his own, unbeknownst to Plaintiffs, that Shine later (after meeting with Snider on July 10, 2011) remarked to Whitsitt that Levien had "[l]ied" to Plaintiffs. (Def.'s Mot. Summ. J., Ex. C2.)

23    Finally, the Court addresses an issue which has been repeatedly argued by Plaintiffs.  Plaintiffs have frequently cited the deposition testimony of Snider, CSLP's CEO, for the proposition that the term "Purchaser" includes an entity such as Sixers Holdco owned "in whole or part" by a purchaser such as Levien.  (See Pls.' Opp'n Def.'s Mot. Summ. J. 2-3; Pls.' Reply 15-18; Pls.' Resp. Opp'n Def.'s Mot. Recons. 3-4.)  Specifically, Snider testified as follows:

Q. The question, sir, is in paragraph two, number two. Does the term purchaser include an entity owned in whole or part by purchaser?

A. It says that.

(Hayes Verif., Ex. C; Snider Dep. 27:10-15.) Plaintiffs, extrapolating wildly from this statement, conclude that their interpretation of "Purchaser" is controlling.  CSLP filed objections to Plaintiffs' use of Snider's deposition testimony. (See Doc. 31.)  The Court sustains CSLP's objection.  Snider had no involvement in the formation of the language of this Agreement.  Every piece of evidence indicates that Plaintiffs dealt exclusively with Weinberg in negotiating the terms of the Agreement.  It is therefore questionable why Plaintiffs would ask Snider an abstract question about the meaning of a contractual term in an Agreement he was not party to, and then draw the broadest of conclusions from the inconclusive answer to that abstract question.

Additionally, Plaintiffs' Response in Opposition to CSLP's Motion for Reconsideration does little more than once again cite to Snider's deposition testimony.  It contains no response to CSLP's contention that the "identification" requirement in the first numbered paragraph has not been, and cannot be, met by Plaintiffs.  The Court must therefore agree with CSLP that "Plaintiffs' vitriolic response to [CSLP's] Motion for Reconsideration or for Certification of Interlocutory Appeal…serves one purpose and only one purpose[:] to camouflage the basis upon which CSLP seeks reconsideration of the Court's denial of its Motion for Summary Judgment." (Def.'s Mot. Recons. 1.)

Holdco's purchase of the Sixers until a few days before the closing and months after they first learned of the proposed sale to Sixers Holdco (including Levien's participation therein). Further, Plaintiffs clearly understood that the Agreement required them to identify their potential purchaser to CSLP, but admit that they did not do so.  As such, Plaintiffs have conceded that they did not comply with "identification" requirement in the first numbered paragraph of the Agreement.  Plaintiffs' clear failure to comply with the first numbered paragraph entitles CSLP to judgment as a matter of law. For this reason, the Court grants CSLP's Motion for Reconsideration and reverses its previous denial of CSLP's Motion for Summary Judgment.

An appropriate order follows.